

**IT IS SO ORDERED.**
**Signed October 15, 2015**

*Arthur S. Weissbrodt*

**Arthur S. Weissbrodt**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

<table>
<tr><td>In re</td><td>]</td><td>Case No. 07-52664-ASW</td></tr>
<tr><td></td><td>]</td><td></td></tr>
<tr><td>BIC PHO,</td><td>]</td><td>Chapter 7</td></tr>
<tr><td>Debtor.</td><td>]</td><td></td></tr>
<tr><td>_____</td><td>]</td><td></td></tr>
<tr><td>NARA BANK,</td><td>]</td><td>Adv. Proc. No. 07-5199</td></tr>
<tr><td>Plaintiff,</td><td>]</td><td></td></tr>
<tr><td>vs.</td><td>]</td><td></td></tr>
<tr><td>BIC PHO,</td><td>]</td><td></td></tr>
<tr><td>Defendant.</td><td>]</td><td></td></tr>
<tr><td>_____</td><td>]</td><td></td></tr>
</table>

**MEMORANDUM DECISION**

This matter came before the Court for a trial on Plaintiff Nara Bank's adversary claims against Defendant and Debtor Bic Pho. At the trial, Plaintiff was represented by attorneys Joon W. Song and Joshua A. Gratch. Defendant was represented by attorney Stanley A. Zlotoff.

Plaintiff called three witnesses: Defendant, Frank Hicks, and Sang Oh. Mr. Hicks was offered as a handwriting expert, and Mr. Oh

testified as an employee of BBCN Bank, Plaintiff's successor in interest. Defendant called no other witnesses. After considering the evidence presented at trial, along with the oral and written arguments of the parties, the Court finds and concludes that Plaintiff's claim is dischargeable under 11 U.S.C. § 523(a)(2).

**I. Background**

Plaintiff Nara Bank[1] commenced this proceeding against Defendant, Bic Pho, by filing an adversary complaint ("the Complaint") on November 20, 2007, asserting seven causes of action. The Complaint stated causes of action under 11 U.S.C. §§ 523(a)(2), (a)(4), and (a)(6), for conversion, imposition of a constructive trust, accounting, and unjust enrichment. In addition to seeking a judgment of non-dischargability, Plaintiff also sought an award of punitive damages. Defendant filed an answer denying all claims.

The Court tentatively granted summary judgment to Defendant on Plaintiff's 11 U.S.C. § 523(a)(4) and (a)(6) claims. Plaintiff did not contest that ruling. Accordingly, Plaintiff's claims for relief under 11 U.S.C. § 523(a)(4) and 11 U.S.C. § 523(a)(6) are hereby dismissed.

Similar to Plaintiff's claim for non-dischargability under 11 U.S.C. § 523(a)(6), Plaintiff's claims for conversion, imposition of a constructive trust, accounting, and unjust enrichment rest upon the allegation that Defendant misappropriated the loan proceeds. However, as explained by the Court at the January 18, 2013 hearing on summary judgment, to the extent that Defendant

---

[1] According to Mr. Oh's testimony, around November 2007, Nara Bank merged with Center Bank after the subject loan was made, and is now known as BBCN Bank.

misappropriated the loan proceeds transferred from Plaintiff to Vision Quest, the proper party with standing to bring such a claim would be Vision Quest and not Plaintiff. The loan proceeds were disbursed by Plaintiff to Vision Quest, who became the owner of the funds. The loan proceeds were not entrusted to Defendant by Plaintiff, therefore these actions arising from Defendant's alleged misappropriation of the loan proceeds must be brought by Vision Quest, not Plaintiff. Accordingly, Plaintiff's claims for conversion, imposition of a constructive trust, accounting, and unjust enrichment are also dismissed,[2] and the only claims remaining before the Court are Plaintiff's claims for relief under 11 U.S.C. § 523(a)(2).

## II. Findings of Fact

Plaintiff's claims are based on an acknowledged debt arising in late 2006 and early 2007. In late 2006, Defendant, who was the 50% shareholder and real estate broker of Vision Quest, requested a loan in the amount of $300,000 on behalf of Vision Quest. Defendant submitted two business loan applications to Plaintiff and also executed a Commercial Security Agreement whereby Defendant personally guaranteed the loan to Vision Quest.

According to Defendant, Vision Quest was a real estate brokerage firm which dealt in residential real estate. Defendant, who had an engineering degree, founded the business and became its broker-of-record. At some point later, David McCain became a 50%

_____

[2] In apparent acknowledgment that such claims are not going forward, Plaintiff has not briefed any claims for conversion, imposition of a constructive trust, accounting, or unjust enrichment. Plaintiff's trial brief deals only with claims under 11 U.S.C. § 523(a)(2) and the request for punitive damages.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

owner and chief financial officer, and Defendant took on the role of chief executive officer.  In 2006, Vision Quest mainly dealt with real estate valued between $600,000 and $1 million, mostly in San Jose but also in surrounding areas, such as Evergreen.  At that time, Vision Quest had between 300 and 400 agents working for the company.

Vision Quest did business as Century 21 Su Casa.  Defendant testified that in late 2006 and early 2007, Century 21 Su Casa had several branches located in San Jose, Fremont, and Hollister, and Defendant explained that additional branches were allegedly being built in Fresno and Los Banos.  Defendant stated that Defendant visited all of the branches and trained all of the agents at each branch.

Defendant testified that in order to finance Vision Quest's expansion, Defendant, as President of Vision Quest, applied for a $300,000 loan from Plaintiff, Nara Bank. Payments on the loan from Plaintiff were to be interest-only, with a balloon payment at the end of the loan term.[3]  In applying for the $300,000 loan from Plaintiff, Defendant, as President of Vision Quest, made four written representations to Plaintiff which are discussed _infra_: (1) the loan proceeds were for business expansion; (2) neither Vision Quest nor Defendant was a party to any lawsuit; (3) Vision Quest did not have any undisclosed business loans or lines; and (4) Defendant did not have any undisclosed debts owed to others.  These representations were made in the following documents: (1) the

---

[3] According to Mr. Oh, and excluding attorney's fees, $502,021.78 was owed through October 17, 2013, consisting of $300,000 in principal, $201,114.55 in interest, and late charges of $907.23.  Interest since October 17, 2013, has accrued at $85.42 per day. Defendant has not contested these figures.

November 7, 2006 Business Credit Application (the "November 7, 2006, Application"); (2) the December 19, 2006 Business Credit Application (the "December 19, 2006, Application"); (3) Defendant's Financial Statement dated December 19, 2006 (the "Financial Statement"); (4) the Business Loan Agreement dated January 24, 2007 (the "Business Loan Agreement"); and (5) the Commercial Guarantee dated January 24, 2007 (the "Commercial Guarantee).[4]

Plaintiff signed the loan agreement dated January 24, 2007, and transferred $300,000 to Vision Quest on February 9, 2007. The loan proceeds were transferred to a bank account Vision Quest had with Plaintiff. However, there is no further evidence of the nature of any prior dealings between Plaintiff and Vision Quest. Vision Quest made four interest-only loan payments and then defaulted on the loan. Vision Quest filed for Chapter 7 bankruptcy on June 13, 2007, four months after the loan was funded. Defendant, as an individual, filed for Chapter 11 bankruptcy two months later on August 29, 2007. Defendant's bankruptcy case was later converted to a Chapter 7 bankruptcy on June 4, 2009.

Defendant testified that when the loan was made, Vision Quest was not prepared for the declining real estate market and had made an error in business judgment by deciding to expand the business. Also, Defendant stated that Vision Quest was anticipating the receipt of a large commission bonus from the Century 21 franchise in the approximate amount of $400,000, but the bonus was never paid, to the financial detriment of Vision Quest.

---

[4] According to Plaintiff's closing brief, Defendant also made a misrepresentation in the Profit and Loss Statement by omitting debts owed by Vision Quest. However, neither the record nor the document itself suggests that such debts should have been included in the Profit and Loss Statement.

Plaintiff has alleged that Defendant's debt to Plaintiff is nondischargeable under 11 U.S.C. §§ 523(a)(2)(A) and (a)(2)(B) because of the following:

(1) In obtaining the loan from Plaintiff, Defendant falsely represented and warranted to Plaintiff that Vision Quest and Defendant were adequately capitalized, solvent, financially sound, and profitable, with sufficient assets to provide security for the loan, and that there was no litigation pending against either Defendant or Vision Quest.

(2) Defendant falsely represented that the loan proceeds were to be used as working capital by and for the benefit and operation of Vision Quest; Defendant instead diverted the funds to Defendant's personal use.

(3) Defendant provided misleading and materially false financial and other information regarding Defendant and Vision Quest in support of Defendant's representations.

(4) Defendant made the representations knowing of their falsity and with an intent to deceive and defraud Plaintiff.

(5) At the time when the loan was made, Plaintiff believed Defendant's representations to be true and reasonably relied on those representations.  Had Plaintiff known the actual facts, Plaintiff would have refused to advance credit to Vision Quest and Defendant.

Defendant has asserted that Defendant never made any misrepresentations to Plaintiff because Defendant did not sign, or could not remember signing, any of the documents noted above.

Plaintiff's handwriting expert, Frank Hicks, opined about the handwriting and signatures on the documents, and prepared an expert

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

report. Both parties stipulated that Mr. Hicks' report could be admitted in lieu of his direct testimony. According to the report, Mr. Hicks earned his Bachelor of Science in Forensic Science from the University of Mississippi in 1976 and has worked as a Document Examiner from 1977 to the present. Defendant has not disputed Mr. Hicks' qualifications to testify as a handwriting expert.

Mr. Oh, who also testified for Plaintiff, has worked for Nara Bank since 1997. Mr. Oh first worked as a loan officer for a period of five years, reviewing and underwriting loan applications and making approximately five loans per month. In that role, Mr. Oh reviewed tax returns, financial statements, bank statements, credit reports, and UCC searches; visited the businesses applying for loans; interviewed the applicants; analyzed the prospective borrowers' ability to repay the loans; and prepared credit memoranda. Mr. Oh was then promoted to a vice presidential position and worked as a trade finance lender for two years, doing similar work for different clients and making about two to three loans per month. Retaining his vice president title, Mr. Oh was promoted to deputy branch manager, where he assumed supervisory duties. Mr. Oh was later promoted to branch manager and given the title of senior vice president. As the branch manager, Mr. Oh oversaw the lending and deposit origination for the branch, and trained employees in underwriting and other commercial lending functions. Mr. Oh was then promoted to the position of senior credit administrator, retaining his title as senior vice president -- the position which Mr. Oh continued to hold at the time of his testimony. In his current role, Mr. Oh reviews and approves loans. However, Mr. Oh was not involved in making or reviewing the loan at

issue here. Mr. Oh was not present when the loan documents were completed or signed, and did not personally know whether Defendant signed any of the documents at issue in this proceeding.

### A. The Documents

#### 1. The November 7, 2006 Application

The first document, the November 7, 2006, Application, contained the question, "Is the business a party to any claim or lawsuit?" Mr. Oh explained that this question is asked because pending lawsuits are not revealed in credit reports or UCC searches. Next to this question the "no" checkbox was checked. Additionally, the box titled "Current Business Loans/Lines" was left empty, which, according to Mr. Oh's testimony, meant that there were no loans or lines.

According to Mr. Oh, Defendant should have listed any notes or loans payable in that section, including formal loans from a bank or loans from friends or family members. Mr. Oh explained that in this section, Defendant should have listed the names of any creditors, the types of loans, the original amounts of the loans, the balances owing, the amounts of the monthly payments, and the maturity dates. Plaintiff has not provided evidence that Defendant actually understood this to be the case or that anyone explained to the Defendant what the form asked of Defendant.

On the second day of the trial, Defendant testified that the handwriting on this document appeared to be his handwriting, and that the signature appeared to be his signature. Almost a year later on the third day of the trial, consistent with his earlier testimony, Defendant testified that the handwriting on this

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

document "looks familiar" when asked if the handwriting on the document was similar to his handwriting.

Mr. Hicks evaluated the signature on the November 7, 2006 Application. In doing so, Mr. Hicks used a sampling of signatures, including signatures on 15 original documents. In Mr. Hicks' opinion, the signatures were written rapidly, without hesitation, which resulted in variations between the signatures. For this reason, Mr. Hicks did not suspect that the signatures were forged; however, Mr. Hicks acknowledged that if there was someone skilled at forging Defendant's signature, then Mr. Hicks would not have been able to detect it. Mr. Hicks also observed that the application was filled out with printed text in a different color ink than the signature. However, Mr. Hicks stated that printed text and cursive cannot be compared. According to Mr. Hicks, he was not asked to compare the printed text in the documents with exemplars of the Defendant's printed handwriting.

According to Mr. Hicks' report, there was a strong probability that Defendant signed the November 7, 2006 Application. The report explains that there are several degrees of certainty which document examiners use when comparing a signature to exemplars of an individual's signature. Mr. Hicks used the second highest degree of certainty when comparing the November 7, 2006, Application with exemplars of Defendant's signature. The only limitation preventing Mr. Hicks from expressing the highest degree of certainty was that Mr. Hicks examined a photocopy of the November 7, 2006 Application rather than the original document. Mr. Hicks testified on cross-examination that it was possible that Defendant's signature from

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

another document was superimposed onto the November 7, 2006, Application.

According to Defendant, the information Defendant included in this document was correct, to the best of Defendant's knowledge. However, Defendant stated that Defendant did not discuss this document with his business partner, Mr. McCain. Defendant conceded that Defendant should have spoken with Mr. McCain about the application, and admitted that Defendant did not inquire of anyone about whether Vision Quest was a party to any pending lawsuits before signing this application. Defendant also testified that Defendant had been led to believe by Plaintiff's representative, Rick Pak, that the loan application process would be simple and that the loan was virtually certain to be made.[5]

Defendant did not recall signing the November 7, 2006, Application. Defendant conceded that the signature appeared to be his signature, but Defendant was also aware that there was at least one person within his company at the time the document was signed who could, and did, forge his signature on behalf of Vision Quest. Defendant testified that these forgeries occurred multiple times. Defendant also testified as to the existence of a stamp bearing his signature. However, Defendant did not offer the stamp into evidence, nor did Defendant name any specific person who could forge his signature. No other witness testified to the existence of such a person, and Defendant did not point to any specific documents that bear Defendant's forged or stamped signature. Defendant stated that Vision Quest's employees occasionally joked

---

[5] Rick Pak was not offered as a witness at trial or deposed. The spelling of Mr. Pak's name in the transcripts varied, and was sometimes spelled "Pack."

that Defendant's signature could be forged, and Defendant knew this had happened but had not made any effort to put a stop to the practice.

Defendant also testified that Defendant signed many documents while at Vision Quest.  Sometimes, documents were presented to Defendant in a "big pile" for Defendant to sign; in such a circumstance, it was Defendant's practice to sign and hand back the documents to whoever had presented them for signature.

### 2. The December 19, 2006 Application

The second document, the December 19, 2006 Application, contained the same representations as the November 7, 2006, Application, plus a notation that the loan was for "working capital."  Mr. Oh explained that "working capital" could mean that the applicant planned to use the loan proceeds to pay for normal operating expenses, such as rents, wages, and utilities.

Unlike with the November 7, 2006, Application, Mr. Hicks examined the original December 19, 2006, Application, instead of a photocopy.  In examining the signature on the December 19, 2006, Application, Mr. Hicks determined, to the highest degree of certainty, that Defendant signed this document.

Defendant testified that Defendant did not recall signing this document.  Defendant also testified that Defendant did not fill out the information on this document. Defendant was certain of this because the printed handwriting on the document was not his handwriting and was also in a different color ink.

Defendant's testimony on the subject was corroborated by the testimony of Sang Oh, Plaintiff's senior loan officer.  Based on

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

the handwriting, Mr. Oh testified that Ms. Park,[6] another employee of Plaintiff at the time the document was signed, "may have helped complet[e] this loan application." According to Mr. Oh, this was common practice when a loan application was incomplete.

### 3. The Financial Statement

According to Mr. Oh, the third document, the Financial Statement dated December 19, 2006, was a statement of the guarantor's financial health; this document showed that Defendant had a personal net worth of $2.7 million, with income of $200,000 per year. The Financial Statement had a notation that the loan's purpose was to assist the borrower in business expansion; according to Mr. Oh, the interview process revealed that Defendant had plans to expand the business to Gilroy. The Financial Statement had a box titled "Notes Payable," which, per Mr. Oh's testimony, referred to any debts owed to others by Defendant. The "Notes Payable" box was left empty, thereby indicating to Mr. Oh that there were no such notes. Further, the document also had the "no" box checked next to the question, "Are there any suits, judgments executions of attachments against you pending?"

Similar to the other documents noted above, Defendant testified that Defendant did not recall signing this document. In addition, Defendant did not believe that Defendant prepared the document; Defendant stated that the handwriting on the document was

---

[6] Mr. Oh did not testify as to Ms. Park's first name. However, Mr. Oh also testified about an employee named Nayun Park, who underwrote the loan. It was unclear from the testimony whether this was the same person. Ms. Park's name in the Court transcripts appears as Niam Park. However, Plaintiff's credit recommendation memorandum indicates that it is spelled Nayun Park.

not his, and was in a different color ink.  Also, Defendant testified that the document was inaccurate, and if Defendant had been the person to prepare the document, it would have contained additional information.

Mr. Hicks examined the original document and testified to the highest degree of certainty that Defendant signed this document. Mr. Hicks also observed that the signature on the Financial Statement was a different color than the printed text throughout the document.

### 4. The Business Loan Agreement

The fourth document, the Business Loan Agreement dated January 24, 2007, a typed document, contained a provision that the financial statements provided by borrower, Vision Quest, were accurate, and that Vision Quest had "no material contingent obligations" except as disclosed in such financial statements.  Per Mr. Oh's testimony, contingent obligations would have included any pending lawsuits. There is no evidence that Defendant understood what the phrase material contingent obligations meant to Plaintiff or that anyone explained the phrase to Defendant.

As with the prior documents, Defendant testified that Defendant did not recall signing this document.  Mr. Hicks examined the original document and testified to the highest degree of certainty that Defendant signed the document.

### 5. The Commercial Guarantee

The fifth document, the Commercial Guarantee dated January 24, 2007, another typed document, contained a provision stating that

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

the financial information provided by the guarantor -- who was Defendant -- was accurate and that there was no litigation or claim pending or threatened against the guarantor. As with the previous document, Defendant testified that Defendant did not recall signing this document, but agreed that the signature appeared to be Defendant's signature. Mr. Hicks examined the original document and testified to the highest degree of certainty that Defendant signed the document.

**B. The Loan**

Mr. Oh did not participate in the Plaintiff's decision to loan $300,000 to Vision Quest. In preparation for this lawsuit, Mr. Oh reviewed the Defendant's loan file, including the business credit applications, the profit and loss statement, Defendant's personal financial statement, Vision Quest's tax returns, Defendant's personal tax returns, Vision Quest's bank statements, Defendant's bank statements, a business loan agreement, a commercial guarantee, and a promissory note. Mr. Oh also reviewed Defendant's personal credit report from Experian Credit Bureau. Mr. Oh stated that the profit and loss statement from Vision Quest reflected a healthy business, transacting approximately $26,000,000 in annual sales with net income of approximately $536,000.

Defendant testified that Vision Quest was expanding, by opening additional branch offices, at the time Defendant sought and obtained the loan from Plaintiff. Defendant testified that Vision Quest used the money borrowed from Plaintiff for this expansion. Defendant testified that he witnessed that expansion, including Vision Quest opening additional offices in Fresno, California and

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

Los Banos, California.[7] Defendant also testified that he did not personally benefit from any of the loan proceeds. However Defendant lacked specific information about how the loan proceeds were actually used. The evidence as to what happened to the actual dollars that represented the loan proceeds is somewhat confusing.

As evidenced by Vision Quest's bank account statement from Nara Bank for February 9, 2007 to February 28, 2007, the $300,000 in loan proceeds were transferred from Plaintiff to Vision Quest's account ending in 3301 on February 9, 2007. Then the entirety of the $300,000 was transferred out of Vision Quest's account by two transactions to another account at Nara Bank ending in 2406: (1) a wire transfer of $100,000 and (2) a check made out to Nara Bank for $200,000. Mr. Oh has testified that the account ending in 2406 belongs to Defendant. Defendant has not contested that the account belongs to him. The Advice of Charge/Credit evidencing the wire transfer indicates that the transfer occurred on February 12, 2007. The check made out to Nara Bank indicates that the check was deposited on February 13, 2007.

Perhaps in anticipation of receiving the loan proceeds, Defendant apparently wrote two checks on Defendant's account ending in 2406 before the loan proceeds were transferred to that account. One check for $200,000 was made payable to Vu Enterprises, Inc. and was dated February 8, 2007. There is no testimony regarding what Vu Enterprises is or its relationship to Vision Quest or to

---

[7] The credit recommendation memo written by Plaintiff indicated that Defendant intended to use the proceeds to expand his business to Gilroy, California.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

Defendant.[8] Another check for $100,000 was made payable to Century 21 Su Casa, Vision Quest's dba, and was dated January 8, 2007. According to the dates on the back of these checks, neither one was deposited until February 9, 2007 – the same day that the loan proceeds were disbursed. The record is unclear as to the exact dates(s) these two checks cleared. However, the bank account statement for Defendant's account at Nara Bank shows that a total of $300,000 was transferred from Defendant's account by these two checks.

When asked about the $200,000 check to Vu Enterprises, Inc., Defendant thought that the check had been endorsed by a stamp bearing Defendant's signature, because the signature was dark. Defendant did not recognize the handwriting on the check. Mr. Hicks did not review, or testify about, the checks.

### C. The Lawsuits

The parties stipulated that there were eleven lawsuits filed and pending against Vision Quest, or Defendant, or both, as of November 2006 through January 2007. The damages alleged in the complaints of these lawsuits ranged from approximately $35,000 to over $1,000,000. One of these lawsuits -- filed in August 2006 -- was based on a mechanic's lien and alleged damages of approximately $140,000. Another lawsuit involved a dispute between franchisor, Century 21, and franchisee, Vision Quest. However, according to Defendant, most of these lawsuits appeared to be suits

---

[8] Vu Enterprises, Inc. is the payable party on a $200,000 check made on Mr. Pho's account. According to the back of this check, the $200,000 was deposited into a Vu Enterprises, Inc. account at Cathay Bank.

that would have been covered by Vision Quest's errors and omissions insurance.

Defendant testified that at the time the loan documents were signed, Defendant did not know of the lawsuits and therefore checked "no" when asked for that information on the November 7, 2006 Application. According to Defendant, Defendant was named in these lawsuits only because Defendant was the broker of record for Vision Quest and not because Defendant was personally involved in the underlying transactions that gave rise to the suits. However, Defendant also testified that Defendant had been responsible for overseeing the underlying transactions.

According to Defendant, between November 2006 and January 2007, attorney Shawn Parr served as Vision Quest's counsel. Defendant testified that if Defendant wished to know about any pending lawsuits against either Vision Quest or Defendant, Defendant could have asked Mr. Parr. Defendant testified that he did not speak to Mr. Parr regarding any information on the November 7, 2006 Application.[9]

There was evidence that Defendant knew about**,** or had notice of**,** at least three lawsuits before Defendant signed any of the loan documents: <u>Mendoza v. Pho</u>, <u>Altman v. Contreras</u>, and the Century 21 lawsuit. Prior to November 7, 2006, but within the same year, Defendant signed a verification of discovery and verified answer for both the <u>Mendoza</u> and <u>Altman</u> lawsuits. Moreover, according to Defendant's deposition, Defendant was personally served with the legal papers for the Century 21 lawsuit. While Defendant testified that he was not otherwise involved in the lawsuit with Century 21,

[9] Mr. Parr was not called as a witness by either party.

Defendant also testified that Mr. Parr occasionally informed Defendant that Defendant needed to be present somewhere in connection with the Century 21 dispute. Defendant testified that he believed the lawsuit would be resolved at the end of 2006 because Vision Quest did what was requested by Century 21. There is no evidence that anyone informed Defendant that the lawsuit was, or was not, resolved.

In addition, after Defendant signed the November 7, 2006, Application and December 19, 2006 Application, but before Defendant signed the Business Loan Agreement and the Commercial Guarantee, both dated January 24, 2007, Defendant verified discovery responses for the Altman lawsuit on January 4, 2007, the Century 21 lawsuit on January 12, 2007, and the Serrata v. Castro lawsuit on January 11, 2007.

### D. Omitted Debts

At trial, Plaintiff presented evidence of eight different promissory notes made payable to the order of Genrieta G. Yevdayeva.[10] Defendant had signed three of the eight promissory notes as borrower and guarantor. These notes were dated February 12, 2002, March 4, 2004, and December 14, 2004. These three notes were for the amounts of $103,000, $50,000, and $120,000, respectively. Defendant testified that Defendant neither recalled signing these notes nor the existence of these loans because all financial matters of Vision Quest were handled by David McCain, Vision Quest's chief financial officer. According to Defendant,

---

[10] The spelling of Ms. Yevdayeva's first name varied in the transcripts, and sometimes appeared as "Jenrietta" or "Greta."

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

Ms. Yevdayeva was a friend of Mr. McCain.  However, pursuant to Defendant's prior declaration dated August 11, 2010, in an adversary proceeding between Ms. Yevdayeva and Defendant, Defendant admitted to signing these three promissory notes.  Defendant also testified to signing these notes in Defendant's May 14, 2009 deposition as a borrower on behalf of Vision Quest.

Mr. McCain signed, as borrower and guarantor, the remaining five notes dated April 18, 2005, September 1, 2005, November 22, 2005, February 6, 2006, and May 15, 2006.  Defendant testified that the signatures on these promissory notes looked like Mr. McCain's signature.  These notes were for the amounts of $150,000, $210,000, $200,000, $150,000, and $100,000, respectively.  The February 6, 2006, and May 15, 2006, promissory notes had the notation "for C21 Su Casa," which appeared to be an abbreviation for Vision Quest's dba "Century 21 Su Casa."

Defendant's deposition indicated that Defendant was aware that Ms. Yevdayeva loaned somewhere between $800,000 to $1,000,000 to Vision Quest.  This range corresponded with the total dollar amount of the eight promissory notes ($1,083,000) and the total dollar amount of the five promissory notes signed by Mr. McCain ($710,000).  According to Defendant's deposition, these loans were not fully repaid at the time the loan documents with Plaintiff were signed in late 2006 and early 2007.  According to Defendant's and Vision Quest's Schedule F, the amount still owing to Ms. Yevdayeva as of the date of both Vision Quest's and Defendant's bankruptcy filings in 2007 was $933,000.

Defendant did not deny the existence of any of the loans or that Mr. McCain made Defendant aware of the loans.  There was no

evidence as to when Mr. McCain informed Defendant of the five notes that Defendant did not sign, or the status of their repayment. Further, the three promissory notes that Defendant signed all had repayment dates prior to 2006.

According to Defendant's deposition, there was also a loan to Vision Quest by Defendant's older brother, Bang Pho, which was outstanding between 2006 and 2007. According to Vision Quest's Schedule F, the amount of the loan was $865,000. However, there was no evidence that Defendant was aware that this loan remained unpaid when any of the loan documents were signed, and Defendant could not recall the specific dollar amount of the loan.

There were additional debts listed on both Vision Quest's and Defendant's Bankruptcy Schedules. However, except for the debts noted above, the remaining debts were not corroborated by any specific testimony or other evidence during trial.[11]

**E. Plaintiff's Reliance**

Mr. Oh testified that, in his opinion, Plaintiff would have relied on all of the information provided by Defendant in deciding to fund the loan.[12] In addition to the information provided by Defendant, Mr. Oh stated that, according to a BSA checklist, Rick

---

[11] During trial, the Court explained to counsel that just because a debt is listed in the bankruptcy schedules does not mean that a loan was made or is still outstanding. In preparing bankruptcy petitions and the accompanying schedules, bankruptcy attorneys frequently list any potential claims -- whether or not legitimate -- in order to protect the bankruptcy petitioner from subsequent contentions that claims were not listed or that creditors were not given proper notice of the bankruptcy.

[12] Mr. Oh was not one of the underwriters of the loan and the evidence is that Mr. Oh was not involved in Plaintiff's decision to lend to Vision Quest.

Pak visited Vision Quest on December 10, 2006, to confirm that the business existed, to observe business operations, and to observe the office setup. However, Mr. Pak was not called to testify at trial; therefore, Mr. Pak did not describe what specific steps Mr. Pak took to evaluate Vision Quest, nor did Mr. Pak testify about any statements or representations Mr. Pak may have made to Defendant or other representatives of Vision Quest during Mr. Pak's visit to the company. While Mr. Oh testified that Mr. Pak was no longer employed with the Bank, no explanation was provided as to why Mr. Pak was not called to testify.

Per Mr. Oh, a written credit recommendation memorandum was prepared by the bank which documented the lender's analysis of the credit applicant. Nayun Park was the person who underwrote the loan and signed off on the credit recommendation memorandum; the memorandum was then passed up the chain of command to the relationship manager, Roy Kim, then to the unit manager, and then to Cliff Sung with the Management Loan Committee. The memorandum cited several sources for repayment of the loan, including business cash flow, liquidation of collateral, and the personal guarantee by Defendant. According to the credit recommendation memorandum, Vision Quest's cash flow was sufficient to repay the debt, given the apparent stability of the business' operating expenses.

Mr. Oh stated that the existence of debts owed to others was important to Plaintiff's decision to lend because those debts could have affected Defendant's ability to repay the loan. According to Mr. Oh, the debts owed to Ms. Yevdayeva, along with any other debts, would have been considered in calculating Vision Quest's cash flow; in addition, Defendant's personal liability on those

loans would have affected Defendant's net worth, as calculated by Plaintiff. Likewise, Mr. Oh stated that the money borrowed by Vision Quest from Defendant's brother would have affected the credit decision.

Mr. Oh testified that Plaintiff verified the financial information provided by Defendant by obtaining a credit report on Defendant's personal creditworthiness. As a result of the credit report on Defendant, Plaintiff learned that Defendant had a very low credit score of 561; Plaintiff considered a score of 660 or below to be subprime, and thought it was possible that Defendant's score was in the bottom third of guarantors for approved loans, possibly even lower. These results were included in the credit recommendation memorandum, which in turn indicated that Plaintiff intended to rely on Defendant's personal guarantee only after relying on the business cash flow and liquidation of the collateral.

Plaintiff did not obtain a credit report on Vision Quest. According to Mr. Oh, because this loan was for only $300,000, it was not customary to have a Dunn and Bradstreet credit report on the business. However, Mr. Oh stated that the bank could have ordered the Dunn and Bradstreet report if there were any red flags.

Mr. Oh observed in the Plaintiff's credit recommendation memorandum that Plaintiff requested a personal explanation from Defendant as to the negative items on Defendant's credit report. Mr. Oh testified that Defendant submitted a written explanation to Plaintiff which Plaintiff found to be consistent with the credit report. Specifically, Defendant explained that Defendant did not recognize some debts listed on the credit report and that Defendant

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

was attempting to resolve those items.  Defendant's explanation was consistent with the credit report, which indicated that Defendant had made a written dispute to the Credit Bureau.  Defendant's explanation was also consistent with Defendant's personal financial statement, which did not include the disputed debts.  According to Mr. Oh, further investigation at that point would have been unreasonable.

Mr. Oh testified that Plaintiff also conducted a UCC search on Vision Quest and discovered that franchisor, Century 21, had a blanket UCC filing on Vision Quest that was not disclosed in any of the financial documents allegedly signed by Defendant, as well as specific UCC filings pertaining to a phone system.  The UCC filing indicated that Century 21 may hold debt secured by property held by Vision Quest.  According to Mr. Oh, this did not cause the Plaintiff any concern as it was customary for a franchisor to have a blanket UCC filing on a franchisee.

However, Mr. Oh testified that there was an internal e-mail between Plaintiff's employees near the time when the loan documents were signed indicating that Plaintiff wished to contact Century 21 to confirm the relationship between Century 21 and Vision Quest.[13] There was no further evidence that Plaintiff ever contacted Century 21, and Mr. Oh admitted that there was nothing in the file to show any follow-up on this issue.

Mr. Oh also testified that the existence of pending lawsuits was important to Plaintiff because a single lawsuit claiming

---

[13] The e-mail indicated that Plaintiff needed the contact information of Century 21, franchisor, "to confirm on UCC senior filing with Century 21 Corporation if embedded in [the] franchise agreement."

damages of approximately $34,000 would have impacted Plaintiff's decision to lend. According to Mr. Oh, pending lawsuits would have indicated to Plaintiff whether a borrower had a "sound in-compliance operation." Furthermore, when asked whether Plaintiff would make the same loan if Plaintiff knew about the pending lawsuits, Mr. Oh testified that Plaintiff would not have made the loan on the same terms and conditions.

Plaintiff did not verify whether Defendant or Vision Quest were involved in any pending lawsuits, and instead, according to Mr. Oh, Plaintiff relied on circumstantial evidence. Mr. Oh stated that a legal search would have revealed the pending lawsuits, but it was not a customary practice unless there was circumstantial evidence that warranted a legal search. According to Mr. Oh, there was no circumstantial evidence at the time that would have led Plaintiff to conduct a legal search.[14] The profit and loss statement indicated that there had been $415,000 in legal fees; Mr. Oh opined that these fees would not have raised a red flag for the Bank, because they were less than two percent of Vision Quest's annual revenue. Mr. Oh also testified about $504,000 in professional fees, but stated that, in his opinion, such an amount also would have raised no red flags.

However, Plaintiff received a title report dated December 26, 2006, which indicated that there was a mechanic's lien recorded in favor of Larry Kent. The lien matched a lawsuit against Vision Quest for approximately $140,000; that lawsuit was filed in August of 2006. Mr. Oh testified that an underwriter of a loan observing a mechanic's lien should have determined whether litigation had

_____

[14] This was not credible for reasons explained herein.

commenced, either by asking questions or requesting additional documents. There was no evidence that such an investigation ever occurred.

Both the November 7, 2006, Application and the December 19, 2006, Application had notations above the signature box which required that if the credit applicant was a corporation, then the application must be signed by the president of the corporation and another officer, such as the chief financial officer. Both documents were signed only by Defendant, the President of Vision Quest, but were not signed by a second officer.

## III. Conclusions of Law

Plaintiff has asserted claims under 11 U.S.C. § 523(a)(2)(A) and (B). Plaintiff has the burden to prove, by a preponderance of the evidence, all of the elements of these non-dischargability claims. <u>Stern v. Stern (In re Stern)</u>, 345 F.3d 1036, 1043 (9th Cir. 2003); <u>Britton v. Price (In re Britton)</u>, 950 F.2d 602, 606 (9th Cir. 1991); <u>Berr v. F.D.I.C. (In re Berr)</u>, 172 B.R. 299, 310 (B.A.P. 9th Cir. 1994) (citing <u>Grogan v. Garner</u>, 498 U.S. 279, 285 (1991)).

### A. Non-Dischargability under 11 U.S.C. § 523(a)(2)(A)

To prove that a debt is non-dischargable under 11 U.S.C. § 523(a)(2)(A), Plaintiff must prove that (1) Defendant made a material representation, (2) knowing at the time that it was false, (3) with the intent to deceive Plaintiff, (4) Plaintiff justifiably relied on such representation, and (5) Plaintiff was proximately damaged as a result. <u>Eugene Parks Law Corp. Defined Benefit</u>

Pension Plan v. Kirsh (In re Kirsh), 973 F.2d 1454, 1457 (9th Cir. 1992).

Additionally, for purposes of § 523(a)(2)(A), the representation must not be a representation respecting the Debtor's or an insider's financial condition. Id.; see also McCrary v. Barrack (In re Barrack), 217 B.R. 598, 605 (B.A.P. 9th Cir. 1998). Regarding this threshold issue, the Court finds that the representations that neither Vision Quest nor Defendant had any undisclosed debts owed to others as of December 19, 2006, or November 7, 2006, and that neither Vision Quest nor Defendant was a party in any claim or lawsuit, were representations about Defendant's and an insider's financial condition.[15] Therefore, such representations cannot support a claim under § 523(a)(2)(A). However, the representation that the loan proceeds were to be used for expanding Vision Quest's business was not a representation regarding an insider's financial condition; therefore, this is the only alleged misrepresentation which could support a claim under § 523(a)(2)(A).

Turning to the first element of § 523(a)(2)(A), Plaintiff asserts that Defendant made a material misrepresentation by stating that the loan proceeds were to be used for Vision Quest's expansion. "A material fact is one touching upon the essence of the transaction." 4 COLLIER ON BANKRUPTCY ¶ 523.08[1][d] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). "Ordinarily, a promise of the borrower that the funds borrowed will be used for a specific

---

[15] At the January 18, 2013 hearing, the Court tentatively found that the representation that Vision Quest was not a party to any lawsuit was a representation regarding an insider's financial condition. No party has argued to the contrary.

purpose would not be material" unless the debtor never intended to use the funds for the purpose stated. <u>Comerica Bank, N.A. v. Weinhardt (In re Weinhardt)</u>, 156 B.R. 677, 680 (Bankr. M.D. Fla. 1993). Here, Plaintiff has not proven that the loan proceeds were never intended to be used for expanding Vision Quest's business. While Plaintiff has suggested that the loan proceeds were not used for business expansion, because the entire line of credit of $300,000 was spent within days of the loan being funded, Defendant has testified that the business was in fact expanding following the loan and that Defendant did not personally benefit from the loan proceeds.

Such testimony was unrebutted. Therefore, Plaintiff did not meet its burden of proving the falsity of Defendant's representation that the loan proceeds were to be used for business expansion. As a result, Plaintiff's § 523(a)(2)(A) claim fails, and the Court does not reach the remaining elements of this claim.

**B. Non-Dischargability under 11 U.S.C. § 523(a)(2)(B)**

To prove non-dischargability of a debt under 11 U.S.C. § 523(a)(2)(B), Plaintiff must prove: (1) there was a written representation of fact by Defendant; (2) the representation was material; (3) Defendant knew the representation was false at the time when the representation was made; (4) Defendant made the representation with the intention of deceiving Plaintiff; (5) Plaintiff relied on the representation; (6) Plaintiff's reliance was reasonable;[16] and (7) damage to Plaintiff proximately resulted from the representation. <u>Siriani v. Northwestern Natl.</u>

---

[16] The statutory language in 11 U.S.C. § 523(a)(2)(B) requires reasonable reliance. <u>Field v. Mans</u>, 516 U.S. 59, 68 (1995).

Ins. Co. (In re Siriani), 967 F.2d 302, 304 (9th Cir. 1992); Candland v. Insur. Co. Of N. Amer., 90 F.3d 1466, 1469 (9th Cir. 1996); see also, Gertsch v. Johnson & Johnson, Finance Corp. (In re Gertsch), 237 B.R. 160, 167 (B.A.P. 9th Cir. 1999). The representations at issue for Plaintiff's § 523(a)(2)(B) claim are that neither Vision Quest nor Defendant was a party to any pending lawsuit, and that there were no debts other than those already disclosed in the loan documents.

### 1. Written Representations

The Court finds that Defendant signed the loan documents noted above and therefore made all the representations contained therein. Defendant could not recall signing the documents, but Mr. Hicks' opinion that Defendant signed all of the documents was persuasive and not sufficiently rebutted.

The circumstances in Charokopos v. PNC Bank (In re Charokopos), No. 99-30303DAS, 2000 Bankr. Lexis 89 (Bankr. E.D. Pa. Feb. 8, 2000), cited by Defendant to support the contrary conclusion, are significantly different from the circumstances in this case. In Charokopos, the court credited the defendant's testimony that the defendant did not sign the loan closing documents partly because of the supporting testimony of the defendant's son, and because handwriting experts differed on whether the signatures on those documents belonged to the defendant. By contrast, Defendant in the case at bar could not recall signing the documents, but could not say, definitively, that Defendant did not sign the documents. In fact, Defendant testified that he sometimes would be handed a stack of papers to sign, which he then appeared to sign without paying close attention to what he

was signing, and that some of the signatures looked like his signature. Further, Defendant's supposition that his signature might have been forged, while possible, was not corroborated by any other evidence.

Some facts suggest that at least the December 19, 2006 Application, may have been filled out after Mr. Pho signed the document. In particular, Mr. Oh corroborated Mr. Pho's testimony that the printed text in that document was not his handwriting by stating that Ms. Park may possibly have filled out this document. Ms. Park was not called to testify and no explanation has been provided as to why Ms. Park was not called as a witness. However, Mr. Pho did not testify that he signed any documents in blank. The Court finds that Defendant signed the documents and made all of the representations contained therein.

### 2. Materiality

A statement is materially false for purposes of § 523(a)(2)(B) if it "paints a substantially untruthful picture of financial conditions by misrepresenting information of the type which would normally affect the decision to grant credit." Community Bank of Homewood-Flossmoor v. Bailey (In re Bailey), 145 B.R. 919, 930 (Bankr. N.D. Ill. 1992) (internal quotations and citation omitted). Mr. Oh testified that a single pending lawsuit claiming damages of $34,000 would have affected Plaintiff's decision to lend because it would have indicated that Vision Quest might not have a "sound in-compliance" operation. In light of Vision Quest's stated annual revenue of approximately $26,000,000 and annual net profit of approximately $536,000, the Court finds Mr. Oh's testimony on this point not to be credible. In this financial context, the existence

of a single $34,000 disputed lawsuit would not likely have caused Plaintiff to deny the loan. On the other hand, the existence of eleven different lawsuits with alleged damages ranging from approximately $35,000 to $1,200,000 per lawsuit is highly material. Accordingly, the Court finds that the representation that there were no pending lawsuits to be a material misrepresentation.

Mr. Oh also testified that the existence of other debts would have impacted Plaintiff's calculation of whether Defendant and Vision Quest had the capacity to repay the loan. This testimony was not contradicted, and at the time of Vision Quest's bankruptcy petition, the amount of debt owed by Vision Quest to Ms. Yevdayeva alone amounted to approximately $933,000. Accordingly the Court finds the representation that there were no undisclosed debts to be a material misrepresentation.

### 3. Defendant's Knowledge of Falsity

The knowledge element of a § 523(a)(2)(B) claim may be satisfied by a showing of either actual knowledge of the falsity of a representation, or reckless disregard for the truth of the representation. <u>In re Gertsch</u>, 237 B.R. at 167. "A representation may be fraudulent, without knowledge of its falsity, if a person making it 'is conscious that he has merely a belief in its existence and recognizes that there is a chance, more or less great, that the fact may not be as it is represented.'" <u>Id.</u> at 168. A debtor "cannot simply sign a document that purports to describe his own financial condition without reading it or questioning anyone as to its contents and then be held blameless if the statement contains materially false information." <u>Merchants</u>

Bank of California, a National Banking Assn. v. Oh (In re Oh), 278 B.R. 844, 858 (Bankr. C.D. Cal. 2002).

The Court finds that Defendant had actual knowledge of at least some of the lawsuits filed against Vision Quest and himself. Defendant was personally served with legal papers for the 2006 dispute between Vision Quest and its franchisor, Century 21, and was aware that lawsuits were regularly filed against Vision Quest and Defendant as part of Vision Quest's business. Although Defendant believed that many of the lawsuits would have been covered by errors and omissions insurance, this did not excuse Defendant from disclosing the lawsuits in the loan application documents. Defendant certainly should have done more to inquire as to any pending lawsuits. Defendant should have recognized that the representation that there were no pending lawsuits had a significant chance of being false.

With regard to the omitted debts owed by Vision Quest, Defendant knew that he did not have sufficient knowledge to represent to Plaintiff that there were no undisclosed debts. While Defendant may not have had actual knowledge that any particular debt was still outstanding between November 2006 and January 2007, Defendant was aware that Vision Quest had borrowed money, and that Defendant had personally signed three promissory notes for loans to Genrieta G. Yevdayeva totaling $273,000. Defendant was also aware that Defendant's brother, Bang Pho, loaned money to Vision Quest which was still outstanding in late 2006 to early 2007. Moreover, Defendant admitted that Defendant should have conferred with Mr. McCain, Vision Quest's chief financial officer, about the contents of the application.

1   Defendant argues that the knowledge requirement is not met

2   here because Defendant did not fill out the loan documents himself,

3   and Defendant could properly rely on whoever prepared the document

4   to include accurate information.  Defendant refers to <u>Alside Supply</u>

5   <u>Center Salt Lake City, Div. of Alside Supply, Inc. v. Aste (In re</u>

6   <u>Aste)</u>, 129 B.R. 1012, 1017 (Bankr. D. Utah 1991), where the court

7   found no reckless disregard because debtor relied on a statement

8   prepared by another employee who had access to the information

9   contained therein.  This comparison fails because there is no

10  evidence Defendant knew who prepared the loan documents in the case

11  at bar, or that the person had access to Vision Quest's financial

12  information.  While there was evidence that a different person

13  prepared the loan documents, such person was either never

14  identified, or was identified as having been Ms. Park, an employee

15  of Plaintiff.  Furthermore, the November 7, 2006, Application was

16  most likely filled out by Defendant; Defendant testified twice that

17  the handwriting in the document appeared to be his handwriting.

18  Accordingly, unlike the debtor in <u>Aste</u>, Defendant signed the

19  loan documents with reckless indifference to the truth of the

20  representations contained in the documents.  Therefore, the Court

21  finds that Plaintiff has met its burden to prove knowledge of

22  falsity.

23

24  **4. Defendant's Intent to Deceive**

25  To establish that a debt is not dischargeable under

26  § 523(a)(2)(B) requires a showing of actual or positive fraud.

27  <u>Palmacci v. Umpierrez (In re Umpierrez)</u>, 121 F.3d 781, 788 (1st

28  Cir. 1997) ("An honest belief, however unreasonable, that the

    representation is true and that the speaker has information to

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

justify it is an insufficient basis for deceit."). An intent to deceive "can be inferred from the totality of circumstances, including reckless disregard for the truth." In re Gertsch, 237 B.R. at 167-68; see also; Houtman v. Mann (In re Houtman), 568 F.2d 651 (9th Cir. 1978). The level of recklessness required to infer an intent to deceive must be such that it is greater than simple or inexcusable negligence. Advanta National Bank v. Kong (In re Kong), 239 B.R. 815, 826 (B.A.P. 9th Cir. 1999). A few factors in determining the level of recklessness of a debtor are whether debtor had access to the financial information and whether debtor reasonably relied on anyone or anything for the accuracy of the information. In re Oh, 278 B.R. at 858-59.

As discussed supra, the Court has already concluded that Defendant made the representations in the loan documents with a reckless disregard for their truth. In addition, Defendant readily could have determined if Vision Quest had any pending lawsuits against it by speaking with Vision Quest's counsel, Shawn Parr, yet Defendant did not do so. Likewise, Defendant readily could have determined what debts were still outstanding by speaking with Mr. McCain, Vision Quest's chief financial officer, yet Defendant failed to do so.

By failing to take such simple steps to verify the information contained within the loan documents, Defendant demonstrated a level of disregard for the truth such that the Court finds that Plaintiff

has met its burden to prove the intent element of § 523(a)(2)(B).

**5. Plaintiff's Reliance**

To establish a claim under § 523(a)(2)(B), Plaintiff must prove reasonable reliance. When a debtor has provided materially false information, it does not take much to support a determination that a creditor's reliance was reasonable. Gosney v. Law (In re Gosney), 205 B.R. 418, 421 (B.A.P. 9th Cir. 1996); In re Gertsch, 237 B.R. at 170.

However, a creditor cannot ignore red flags that directly call into question the veracity of the representations on which the creditor would otherwise rely. When red flags are present, a creditor must show why the creditor's reliance was reasonable, notwithstanding any red flags. Heritage Pacific Fin., LLC v. Machuca (In re Machuca), 483 B.R. 726, 736-37 (B.A.P. 9th Cir. 2012). To determine whether reliance was reasonable, the Court employs a "prudent person test," evaluates the totality of the circumstances, and "must objectively assess whether the creditor exercised the same degree of care expected from a reasonably prudent person entering into the same type of business transaction under similar circumstances." Id. at 736.

There was at least one, very substantial, red flag in this case. Before funding the loan, Plaintiff came into possession of a title report dated December 26, 2006, which stated that there was a mechanic's lien recorded against Vision Quest. Plaintiff's own witness, Mr. Oh, testified that an underwriter observing the existence of that mechanic's lien should have determined whether or not litigation had commenced. Clearly no investigation occurred; if it had, Plaintiff would have learned that litigation on that lien -- in which damages of $140,000 were sought -- had commenced in August 2006. This, in turn, would have led a prudent person in Plaintiff's position to conduct a legal search on Vision Quest.

According to Mr. Oh, a legal search would have led to the discovery of the remaining ten lawsuits pending during November 2006 through January 2007. Accordingly the Court finds that Plaintiff did not reasonably rely on Defendant's representation that there were no pending lawsuits against Vision Quest.

There were other false representations; the loan paperwork failed to disclose Vision Quest's and Defendant's outstanding debts. However, the complete omission of eleven lawsuits undercuts the reliability of the entire loan application. In addition, only Defendant signed the November 7, 2006 and December 19, 2006 Applications; these documents, on their faces, clearly, required a second signature from another officer to be considered complete. The fact that no other officer, such as a chief financial officer, signed the November 7, 2006 and December 19, 2006 Applications was another red flag which should have signaled Plaintiff that the application might well be lacking important information about the Defendant's financial condition.

Another red flag was Defendant's extraordinarily low credit score. Although Defendant had provided written explanations about Defendant's credit report that supposedly would have satisfied Mr. Oh, Mr. Oh conceded that Defendant's credit score was approximately 100 points below the Plaintiff's definition of subprime borrowers. This fact, combined with approximately $415,000 in legal fees in Vision Quest's profit and loss statement, and combined with the complete absence of any lawsuits or other loans listed in the application, should have put Plaintiff on notice that there might be a problem in approving the loan. Even though the legal fees, alone, would not have allegedly raised a red flag for Mr. Oh, there was, in fact, no inquiry whatsoever about the fees to determine

1    whether the fees were lawsuit-related.  Moreover, Mr. Oh's

2    testimony that there were no red flags occurred after Plaintiff

3    funded the loan and is self-serving.

4         In addition, Defendant's testimony was that Mr. Pak gave the

5    impression that the approval of the loan was a foregone conclusion;

6    this testimony was unrebutted. This was congruent with the

7    testimony of Mr. Oh that the loan was too small to require a Dunn

8    and Bradstreet report on Vision Quest.  However, given Defendant's

9    very low personal credit score, and the other red flags mentioned

10   above, Plaintiff's failure to obtain a Dunn and Bradstreet report

11   on Vision Quest and Plaintiff's failure to conduct any legal search

12   were both unreasonable under the circumstances.  Since Mr. Pak

13   indicated to Defendant that very little needed to be done to

14   procure the loan, Plaintiff may well have gone into this loan

15   quickly without reasonable diligence. Mr. Pak's apparent attitude

16   may have convinced Defendant that the loan application was more of

17   a formality than a serious request for information and that

18   approval of the loan was a foregone conclusion, but that would not

19   have excused Defendant's recklessness in signing the loan

20   application.

21        Because Plaintiff has failed to establish reasonable reliance,

22   the claim under § 523(a)(2)(B) fails.  Nevertheless, in the

23   interest of a complete record, the Court will address the remaining

24

25   element of this claim.

26

27            **6. Proximate Cause**

28        To establish a claim under § 523(a)(2)(B), Plaintiff must

     prove that damages proximately resulted from the misrepresentation.

<u>In re Siriani</u>, 967 F.2d at 304. "Proximate cause requires both causation in fact (but-for cause) and legal causation." <u>Wilcox v. Carpenter (In re Carpenter)</u>, 453 B.R. 1, 7 (Bankr. D.C. 2011). If the Defendant's misrepresentation in fact induced Plaintiff to approve the loan, and if the misrepresentation was a substantial factor in the loan being approved, then the but-for causation requirement is met. <u>Id.</u> Legal causation is "sometimes said to depend on whether the conduct has been so significant and important a cause that the defendant should be legally responsible." <u>Britton v. Price (In re Britton)</u>, 950 F.2d 602, 604 (9th Cir. 1991) (citing W. Page Keeton et al., <u>Prosser and Keeton on the Law of Torts</u> § 42 at 273 (5th ed. 1984).

The Court finds that there was cause in fact, but not legal cause. But for Defendant's misrepresentations, Plaintiff would not have made the loan, or at the very least would have made the loan on different terms that would have provided more protection to Plaintiff from the risk of loss. However, Plaintiff's damages were proximately caused by Plaintiff's own failure to investigate the mechanic's lien and Defendant's very low credit score. As Mr. Oh testified, an underwriter who observed a mechanic's lien should have taken steps to determine if a lawsuit on that lien was pending. As discussed <u>supra</u>, if Plaintiff had taken reasonable steps, Plaintiff would likely have discovered the remaining ten lawsuits and Defendant's financial problems and, as Mr. Oh testified, Plaintiff likely would not have made the loan. Significantly, according to Mr. Oh, a single lawsuit claiming damages of $34,000 would have impacted the Plaintiff's decision to lend; the lawsuit related to the mechanic's lien was for over four times that amount, <u>i.e.,</u> for $140,000. Had Plaintiff acted with

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1 | reasonable care in reviewing Defendant's loan application,

2 | Plaintiff would not have been damaged.

3 |     Plaintiff has not demonstrated that Defendant's

4 | misrepresentations proximately caused Plaintiff's financial injury.

5 | Therefore, the Court holds that Plaintiff's claim is dischargeable

6 | under 11 U.S.C. § 523(a)(2)(B). Counsel for Defendant shall submit

7 | an order after submitting it to Counsel for Plaintiff as to form.

8 |     IT IS SO ORDERED

9 |         *** END OF MEMORANDUM OF DECISION AND ORDER ***

Court Service List

Nara Bank
Special Assets Department
3731 Wilshire Boulevard
Suite 1000
Los Angeles, CA 90017

Bic Pho
4221 Chaboya Hills Court
San Jose, CA 95148

** Attorneys to be served electronically via ECF